United States District Court
Northern District of California

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HARUE CRAIG,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>COUNTY OF SANTA CLARA, et al.,<br><br>　　　　　　Defendants. | Case No. 17-CV-02115-LHK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 49 |

Plaintiff Harue Craig ("Mrs. Craig") brings this suit against Defendants County of Santa Clara and Santa Clara Sheriff's Department Sergeant Douglas Ulrich ("Sgt. Ulrich") (collectively, "Defendants") for the shooting of Eugene Craig. Before the Court is Defendants' motion to summary judgment. ECF No. 49 ("Mot."). Having considered the parties' briefing, the relevant law, and the record in the case, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment.

## I.　　BACKGROUND

### A.　Factual Background

This case arises from the fatal shooting of Plaintiff Harue Craig's husband, Eugene Craig ("Mr. Craig"), by Sgt. Ulrich on September 12, 2016.

### 1. Initial 911 Call and Welfare Check

On September 12, 2016, the Craigs' granddaughter, Elizabeth Craig ("Elizabeth"), who lives in Arizona, called 911. Def. Ex. K[1] (911 call transcript), ECF No. 54-1; Def. Ex. K-1 (audio recording of 911 call). Elizabeth explained that she had not spoken to her "elderly grandfather" for a week and that she had been trying unsuccessfully to reach him all day. Def. Ex. K at 1:5-6, 2:21-22. Elizabeth stated that her inability to reach Mr. Craig was unusual because typically he answered the phone quickly or, if he missed the call, returned her call as soon as he got home. *Id.* at 5:6-9. Elizabeth added that she expected her grandfather to be at home with her grandmother, Mrs. Craig. *Id.* at 4:12-15. In response to a question by the dispatcher, Elizabeth stated that Mr. Craig had previously had heart surgery and that Mrs. Craig had previously suffered a stroke. *Id.* at 4:8-15. Elizabeth requested that someone go check on Mr. Craig "to see if he's okay." *Id.* at 1:5-6. Elizabeth stated that if the Craigs' silver Nissan Altima was in the garage, the Craigs would be at home. *Id.* at 1:22-24, 3:21-23. The dispatcher then requested that Deputy Alan Reyes conduct a welfare check of the Craigs' address, 12132 Titus Avenue in Saratoga, California. Def. Ex. L, ECF No. 54-3 (radio dispatch transcript) at 1:4-8; Def. Ex. M-1 (audio of radio dispatch) at 00:00-00:39.

Deputy Donald Weyhrauch heard the dispatcher's request and arrived at the Craigs' house first. Def. Ex. A, ECF No. 55-1 (Weyhrauch Dep.) at 10:16-11:1. Deputy Weyhrauch knocked on the front door "and rang the doorbell and announced 'sheriff's office' in a loud voice." *Id.* at 13:10-15. In response, Deputy Weyhrauch heard someone say "hel-," which Deputy Weyhrauch initially interpreted as "hello." *Id.* at 13:16-24. However, no one answered the door, and so Deputy Weyhrauch waited, then knocked again, and then said "sheriff's office" again. *Id.* at 19:9-17. Deputy Weyhrauch then knocked on a window near the front door, and "[a]fter a second or third knock, there was a – sort of a crashing sound coming from the kitchen area, just on the other side of the window [he] had knocked on." *Id.* at 19:19-23. Deputy Weyhrauch hypothesized that

---

[1] Both parties identified exhibits using letters. For clarity, the Court will refer to Defendants' exhibits as "Def. Ex." and Plaintiff's exhibits as "Pl. Ex."

Case No. 17-CV-02115-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

the crashing sound may have been someone falling inside the home. *Id.* at 20:1-10, 20:22-21:15.

However, according to Sgt. Ulrich, Deputy Weyhrauch also characterized the crashing sound as "a cup or something small fall[ing] in the background." Pl. Ex. A, ECF No. 60-1 at 66:11-14 (quotation from unspecified report read to Sgt. Ulrich during his deposition). Deputy Weyhrauch continued to wait, knock, and announce "sheriff's office" for several more minutes. Weyhrauch Dep. at 19:24-20:1, 21:16-22:2. At some point, Deputy Weyhrauch realized that the "hel-" could have been "help," not "hello." *Id.* at 13:16-14:2, 27:25-28:2.

After Deputy Weyhrauch had been at the house for three to five minutes, Deputy Reyes arrived. *Id.* at 21:23-22:2. Deputy Veronica Laguardia also arrived. *Id.* at 22:14-16; Def. Ex. B (Laguardia Dep.), ECF No. 55-2 at 19:20-24. Deputy Laguardia knocked on the front door "[n]umerous times" and announced "sheriff's office," but no one responded. Laguardia Dep. at 20:22-21:6. Deputy Laguardia then called Elizabeth to ask if there was any other place the Craigs might be. *Id.* at 22:22-23:12. Elizabeth responded that if the Craigs' car was in the garage, as Deputy Weyhrauch had already confirmed it was, then the Craigs should be home. *Id.* at 23:13-15. Elizabeth also stated again that Mr. Craig had had heart problems, but Elizabeth did not specify what type of heart problems. *Id.* at 24:1-6. After speaking to Elizabeth, Deputy Laguardia knocked on the front door yet again, but no one responded. *Id.* at 24:23-25:5.

Deputies Weyhrauch, Reyes, and Laguardia then went to the house to the left of the Craigs' and spoke with Karen and Steve Akimoto, the Craigs' friends and neighbors. Weyhrauch Dep. at 12:8-15, 32:1-9; Laguardia Dep. at 27:7-14. The Akimotos told the officers that Mrs. Craig sometimes went for walks by herself, but Mr. Craig typically stayed at home because of his heart issues. Laguardia Dep. at 27:18-21. The Akimotos noted that they heard someone moving the Craigs' trash can to the curb that day, which indicated that the Craigs were home. *Id.* at 29:1-16; Def. Ex. C (K. Akimoto Dep.), ECF No. 55-3 at 29:24-30:5, 31:9-12, 50:1-6; Def. Ex. F (Reyes Dep.), ECF No. 55-6 at 26:11-21. Mrs. Akimoto recalls that she heard the trash cans being moved around 6:00 p.m. K. Akimoto Dep. at 30:1-5.

While Deputy Laguardia continued to speak with the Akimotos, Deputy Weyhrauch

returned to the Craigs' home to see if he could "see in a window or get a better understanding of what was going on in the home." Weyhrauch Dep. at 23:20-21. Deputy Weyhrauch jumped over the fence separating the back yard from the front yard and "[a]s soon as [he] went in that backyard, [he] began loudly identifying [him]self repeatedly" because he did "not want to startle a homeowner in their backyard on their own turf." *Id.* at 23:22-24:5. Deputy Weyhrauch "walked around the entire perimeter knocking on doors and windows" and "repeatedly calling out 'sheriff's office'" and "Eugene." *Id.* at 24:13-19. The windows were blocked by heavy drapes so Deputy Weyhrauch could not see inside the house, but he could tell that the lights were on inside the house. *Id.* at 24:19-21, 25:4-11. Deputy Weyhrauch circled the house three or four times and continued to knock, call out "sheriff's office," and used his flashlight to try to see into the house. *Id.* at 36:25-37:11.

Meanwhile, the Akimotos provided Deputy Laguardia with the phone number of the Craigs' family friend Jim Marshall, whom Deputy Laguardia then called. Laguardia Dep. at 32:1-9. According to Deputy Laguardia, Mr. Marshall believed that the Craigs should be at home and was concerned that the deputies were having difficulty reaching the Craigs. *Id.* at 33:11-20. Mr. Marshall was particularly concerned for Mrs. Craig, because Mr. Marshall had recently witnessed Mr. Craig threaten to hit Mrs. Craig's head against the car if she didn't retrieve a gift from their car more quickly. *Id.* at 33:20-34:1; *see also* Def. Ex. U (Laguardia Interview), ECF No. 52:1 at 24:23-6 (same); Def. Ex. O (transcript of phone interview with Mr. Marshall), ECF No. 54-8 at 10:3-16 (same); Def. Ex. D (Marshall Dep.), ECF No. 55-4 at 26:1-7. In addition, Mr. Marshall mentioned that he and another friend, Ron Roberts, had "had some funny feelings about how the end of life was gonna happen with [Mr. Craig] and his wife." Def. Ex. O at 6:25-7:1. Specifically, Mr. Craig had made "a lot of strange comments" that caused Mr. Marshall and Mr. Roberts to believe that Mr. Craig "was not gonna let that little lady ever end her life all by herself . . . if something happened to him [they] thought [Mr. Craig] was gonna take her with him." *Id.* at 7:6-12. As a result, when Mr. Marshall heard that the Craigs were not responding to knocks on their door or phone calls, Mr. Marshall "thought uh oh, this is it, man. They're – they're dead in

the house." *Id.* at 7:12-15; *see also id.* at 15:19-21 (Mr. Marshall acknowledging in phone interview the day after the shooting that he mentioned a murder-suicide scenario to Deputy Laguardia); Marshall Dep. at 27:21-29:2 (Mr. Marshall stating in his deposition 14 months after the shooting that he did not recall mentioning a murder-suicide scenario to Deputy Laguardia but stating that "it wouldn't surprise me one bit if I did say it" and then stating "I have some slight recollection of something like that, yes"). Mr. Marshall also mentioned that Mr. Craig had heart issues. Laguardia Dep. at 34:24.

After speaking with Mr. Marshall, Deputy Laguardia relayed what she had learned to Deputies Weyhrauch and Reyes. Weyhrauch Dep. at 25:12-26:15. The officers requested that dispatch do a firearms check to determine whether Mr. Craig had any registered firearms. Weyhrauch Dep. at 42:20-43:3; Def. Ex. L at 8:14-18 (dispatch radio transcript); Def. Ex. M-1 at 36:36-37:03 (audio of dispatch radio request). Deputy Laguardia again knocked on the Craigs' front door. Laguardia Dep. at 36:9-19, 37:9-16. At some point, Deputy Laguardia used her flashlight to knock on the door in an attempt to make the knock louder to make sure the Craigs could hear the knocking. *Id.* at 36:16-19. When there was still no response, Mr. Akimoto retrieved what he believed to be a spare key to the Craigs' home and also knocked on the Craigs' front door and called out "Hi, it's your neighbor Steve," but no one answered. *Id.* at 37:13-22; Def. Ex. G (S. Akimoto Dep.), ECF No. 55-7 at 11:16-12:13. Mr. Akimoto then tried to open the Craigs' front door with a spare key, but the key did not work. Laguardia Dep. at 31:3-10, 37:18-22; K. Akimoto Dep. at 33:6-15; S. Akimoto Dep. at 10:25-11:9; Reyes Dep. at 27:20-25, 28:19-22. After that, Mr. Akimoto circled the house, as did Deputy Weyhrauch and Deputy Laguardia. Mr. Akimoto and the officers continued to call out and knocked on the sliding glass door in the back of the house. S. Akimoto Dep. at 16:13-17:14; Reyes Dep. at 28:5-29:8; Laguardia Dep. at 38:11-23, 39:17-19, 41:7-11. No one responded. Deputy Laguardia lay on her stomach next to the sliding glass door to try to see under the curtains, but was unable to see into the house. Laguardia Dep. at 38:25-39:8.

After circling the house, the officers "received the firearms returns from dispatch," which

indicated that Mr. Craig had multiple registered firearms. Laguardia Dep. at 41:18-23; Weyhrauch Dep. at 42:25-43:3; Def. Ex. L at 8:24-9:2 (transcript of dispatch reporting that Mr. Craig had "lots of guns registered to him," including a revolver, two semiautomatic pistols, a Colt semiautomatic pistol, and a modified pistol); Def. Ex. M-1 at 39:15-39:49 (audio of radio dispatch stating same). Deputy Laguardia then called Elizabeth a second time to ask again whether there were any other places that the Craigs could be or any other phone numbers that they used. Laguardia Dep. at 42:10-23. Elizabeth became upset, started to cry, and told Deputy Laguardia that "something bad happened between her grandparents – her grandfather, but she didn't want to get into the details as far as what happened." *Id.* at 42:23-43:5; Def. Ex. E (Ulrich Dep.), ECF No. 55-5 at 38:4-17. Deputy Laguardia asked Elizabeth if Elizabeth wanted the officers to make entry into the home, but Elizabeth did not respond because she was upset. Laguardia Dep. at 43:15-21, 44:16-21. Deputy Reyes spoke with the neighbors to the right of the Craigs' house, the Faxons, but they had just returned from vacation and had no other information to offer besides providing the Craigs' phone number, which the officers already had. Reyes Dep. at 29:17-30:23. When the officers requested earlier that dispatch call the Craigs' phone number, the phone rang fifteen times and no one answered it. Ulrich Dep. at 22:22-25; Ex. L at 4:8-9; Def. Ex. M-1 at 09:55-10:00 (request that dispatch call the Craigs' home phone); Def. Ex. M-2 (audio of phone ringing without answer); Def. Ex. T (Weyhrauch Interview), ECF No. 53-1 at 17:11-17 (Deputy Weyhrauch stating that he heard the phone ringing inside the house). The dispatcher reported back to Deputy Reyes that "the phone just rings." Def. Ex. L at 4:16.

Deputies Weyhrauch, Laguardia, and Reyes eventually determined that they should force entry of the Craigs' home. Weyhrauch Dep. at 38:2-13; Laguardia Dep. at 47:20-48:23. The deputies cited two reasons for deciding that a forced entry was necessary. Weyhrauch Dep. at 30:1-7, 38:5-13, 46:4-12; Laguardia Dep. at 55:22-58:1. First, there were facts to suggest that one or both of the Craigs was in the midst of a medical emergency that prevented them from answering the door. Facts that supported this scenario included, according to Deputies Weyhrauch and Laguardia, the Craigs' advanced age and medical histories, that Elizabeth had been unable to

reach the Craigs by phone, the crashing noise that Deputy Weyhrauch heard, the initial response to

Deputy Weyhrauch's knocking that could have been someone saying "help," and the Craigs'

failure to answer the door despite the prolonged and persistent knocking. Weyhrauch Dep. at

29:22-31:9, 32:22-33:17; Laguardia Dep. at 35:13-24, 49:2-6, 56:2-57:6. Second, the deputies

believed that there may have been domestic violence that resulted in the injury or death of one or

both of the Craigs. Facts that supported the domestic violence scenario included, according to

Deputies Weyhrauch and Laguardia, that Elizabeth had been unable to reach the Craigs by phone,

the crashing noise that Deputy Weyhrauch heard, the initial response to Deputy Weyhrauch's

knocking that could have been someone saying "help," the Craigs' failure to answer the door

despite the prolonged and persistent knocking, Elizabeth's comments about recent turmoil

between her grandparents, and Mr. Marshall's comments about a potential murder-suicide

scenario. Weyhrauch Dep. at 27:23-28:5; Laguardia Dep. at 55:22-56:15, 57:13-58:1; *see also*

Ulrich Dep. at 49:12-51:6 (citing same facts and also discussing facts suggesting that the Craigs

were home).

Sgt. Ulrich arrived on the scene at approximately 8:24 p.m., after the officers had been on

the scene for between twenty minutes and an hour but before the officers attempted to force entry

into the Craigs' home. Weyhrauch Dep. at 37:23-25, 38:2-13; Laguardia Dep. at 40:9-18; Reyes

Dep. at 33:19-25; Ulrich Dep. at 31:9. Sgt. Ulrich reviewed the situation with the deputies.

Ulrich Dep. at 33:11-34:6; Laguardia Dep. at 48:7-12, 48:24-49:18; Weyhrauch Dep. at 39:1-

41:12. Sgt. Ulrich agreed with the deputies' assessment that they should force entry of the Craigs'

home. Weyhrauch Dep. at 39:14-17. The officers then donned ballistic helmets and Deputy

Weyhrauch donned a vest with ballistic panels. Weyhrauch Dep. at 47:4-21, 48:23-25.

Another friend of the Craigs', Ron Roberts, then arrived. Mr. Roberts wanted to try

knocking on the Craigs' door, but the officers "wouldn't talk to [Mr. Roberts]," told him to "get

away," and commented that there was "a fanatical NRA guy in [the house] with guns," according

to Mr. Roberts. Pl. Ex F (Roberts Dep.), ECF No. 60-6 at 14:13-17. According to Deputy

Weyhrauch, the officers decided that Mr. Roberts' knocking was unlikely to be successful given

United States District Court
Northern District of California

the Craigs' failure to respond to knocking so far. Weyhrauch Dep. at 49:22-50:10. Deputy

Laguardia thus asked Mr. Roberts to stay back. Ulrich Dep. at 58:9-10; Weyhrauch Dep. at 50:11-

15. However, Mr. Roberts reapproached the officers and told them that Mr. Craig "has guns and

he keeps them in a safe. . . . And he said that [Mr. Craig] also sleeps with a revolver underneath

his pillow." Ulrich Dep. at 58:15-19; Weyhrauch Dep. at 42:25-5 (mentioning that Mr. Craig slept

with a gun under his pillow); Roberts Dep. at 14:20-15:8. Mr. Roberts thus warned the officers

that "if you disturb [Mr. Craig] and wake him up, you might get shot, because he does sleep with a

gun. But he wouldn't bother nobody else other than that." Roberts Dep. at 15:5-8. Mr. Roberts

also testified that he told the officers that Mr. Craig had lost the combination to the safe in which

Mr. Craig kept the other guns that were not under his pillow. Roberts Dep. at 32:20-33:6.

The officers continued to prepare to force entry of the Craigs' home. Specifically, Deputy

Weyhrauch then pulled his patrol SUV, which says "sheriff" and has a star on the side, into the

Craigs' driveway and turned on the spotlights, the red and blue flashing lights, and the dash

camera. Weyhrauch Dep. at 51:1-5; Laguardia Dep. at 64:18, 65:4-10; Weyhrauch Interview at

26:8-24; *see* Def. Exs. S-9, S-10, S-13 (photos of patrol SUV and patrol SUV with lights on), ECF

No. 54-12; Def. Ex. N-1 at 7:20-7:36 (dash camera video of SUV being positioned in driveway).

Deputy Weyhrauch did so "[s]o that when [the officers] eventually made entry, there would just be

. . . no doubt" that it was the sheriff's office entering the home. Deputy Weyrauch also believed

that the SUV's lights would provide extra lighting and that the SUV itself could provide additional

cover if firearms were used. Weyhrauch Dep. at 51:6-19. Sgt. Ulrich radioed dispatch that the

officers were going to force entry and requested that fire and medical personnel stand by to render

aid if necessary. Ulrich Dep. at 88:10-22; Def. Ex. L at 11:1-12 (dispatch radio transcript); Def.

Ex. M-1 at 51:00-51:55 (dispatch radio audio).

### 2. Entry of Garage and Shooting

The officers then approached the Craigs' front door. Sgt. Ulrich "banged on the [Craigs']

door" and "repeatedly announced 'sheriff's office'" in a loud voice. Weyhrauch Dep. at 52:7-17;

Def. Ex. N-1 at 7:50-8:28 (dash camera footage with audio of Sgt. Ulrich knocking and saying

"Eugene, sheriff's office, open the door please"). Sgt. Ulrich also said, "Eugene, open the door or I am going to kick it in." Def. Ex. N-1 at 8:10-8:12. When no one responded, Sgt. Ulrich then tried kicking in the front door, but the front door did not move. Weyhrauch Dep. at 52:18-22; Ulrich Dep. at 68:13-18; Laguardia Dep. at 65:11-17; Ex. L at 11:14-16; Def. Ex. M-1 at 53:03-53:10, 54:34-54:45 (dispatch radio audio). The officers then moved to the backyard, where the garage had a rear door. *See* Def. Exs. S-4, S-5, S-7 (photos of garage showing rear door); Def. Ex. L at 11:14-16 (dispatch radio transcript); Def. Ex. M-1 at 54:34-54:45 (dispatch radio audio). Sgt. Ulrich knocked, yelled "sheriff's office," and then kicked in the garage's rear door. Ulrich Dep. at 68:19-24; Laguardia Dep. at 72:10-18; Weyhrauch Dep. at 53:2-4, 54:4-19.

Sgt. Ulrich then entered the garage, followed by Deputies Weyhrauch, Laguardia, and Reyes, respectively. Weyhrauch Dep. at 54:23-55:1; Def. Ex. M-1 at 54:53-54:56 (dispatch radio audio of Deputy Weyhrauch stating that the officers were "entering through the garage"). Deputy Weyhrauch yelled "sheriff's office" several more times after entering the garage. Weyhrauch Dep. at 55:5-7. The garage's lights were off, but the patrol SUV's lights allowed the officers to see inside the garage. Weyhrauch Dep. at 59:23-60:1; Ulrich Dep. at 72:7-12. The Craigs' car was in the garage, with the front of the car facing the garage's rear door. Weyhrauch Dep. at 55:13-19; Def. Exs. S-5, S-7 (photos showing car positioned in garage); Ulrich Dep. at 69:11-13. The officers walked between the passenger side of the car and the wall of the garage, which had several ladders leaning against it and also had cabinets. Weyhrauch Dep. at 55:8-19; Def. Exs. S-1, S-2, S-3, S-7 (photos of garage showing ladders, cabinets, and car). The officers then approached a door connecting the garage to the Craigs' home. The door was two steps above the level of the garage floor. Weyhrauch Dep. at 56:14-18; Ulrich Dep. at 73:23-74:1; Def. Exs. S-2, S-3, S-7 (photographs showing steps up to door leading to house). Sgt. Ulrich positioned himself to the right of that door. Ulrich Dep. at 71:19-20; Weyhrauch Dep. at 55:23-56:1. Deputy Weyhrauch was to the left of the door, with Deputy Laguardia behind him and Deputy Reyes behind Deputy Laguardia. Weyhrauch Dep. at 55:23-25; Reyes Dep. at 51:22-25; Ulrich Dep. at 71:7-11.

Sgt. Ulrich did not knock on or announce his presence at the door leading into the Craigs' house. Pl. Ex. I (Ulrich Interview) at 31:18-24. Instead, Sgt. Ulrich kicked in the door leading to the Craigs' house. Weyhrauch Dep. at 56:2-13; Ulrich Dep. at 69:19-23. The door swung open and then closed, so Sgt. Ulrich pushed it open again with his hand. Ulrich Dep. at 70:12-71:9; Weyhrauch Dep. at 60:24-61:5. The officers again announced themselves as sheriff's deputies, and Sgt. Ulrich moved to the right of the door. Ulrich Dep. at 71:14-19; Weyhrauch Dep. at 56:10-13, 57:11-13. Deputy Weyhrauch saw Mr. Craig come around a corner inside the house in "kind of a slow, shuffling walk." Weyhrauch Dep. at 67:10-11. Sgt. Ulrich described Mr. Craig's walk as "very cautious," "methodical," and "determined." Ulrich Dep. at 80:1-5. Mrs. Craig stood behind Mr. Craig. Weyhrauch Dep. at 68:24-69:2, 69:14-18; Ulrich Dep. at 78:8-12. According to Deputy Weyhrauch, Mr. Craig was holding a revolver "down by his side, in his right hand" and was moving toward the door to the garage. Weyhrauch Dep. at 67:12-13, 68:3-5. Deputy Weyhrauch testified that he did not see Mr. Craig raise the gun. Weyhrauch Dep. at 71:16-20. Sgt. Ulrich testified that Mr. Craig held the gun in a "slightly canted" position, such that it was pointed at the officers, because the garage, where the officers were, was several feet below the house, where Mr. Craig was. Ulrich Dep. at 73:16-74:3.

As soon as Deputy Weyhrauch saw that Mr. Craig was holding a gun, Deputy Weyhrauch yelled two or three times, "Eugene, drop the gun. Sheriff's office. Drop the gun." Weyhrauch Dep. at 68:18-24, 69:24-25; Ulrich Dep. at 72:6, 72:13-19, 73:11; *see also* Laguardia Dep. at 81:9-22 (testifying that "drop the gun" was said multiple times); Reyes Dep. at 54:6-14 ("I just remember hearing, "Sheriff's office. Drop the gun. Drop the gun."); *id.* at 57:4-10 (testifying that "drop the gun" was said multiple times).

Deputy Weyhrauch testified that he made eye contact with Mr. Craig, who did not comply with or otherwise acknowledge the commands to drop the gun. Weyhrauch Dep. at 70:6-9. Deputy Weyhrauch described Mr. Craig as having a "steely gaze" and "sort of this really grim, sort of like a determined look in his eye" and stated that Mr. Craig "seemed just determined to march out." Weyhrauch Dep. at 70:7-8, 70:10, 71:3. Sgt. Ulrich described Mr. Craig's demeanor

10

as "very catatonic or like he was in a trance." Ulrich Dep. at 78:6-7. Sgt. Ulrich also yelled "drop the gun." Ulrich Dep. at 76:22-24. At the same time, Sgt. Ulrich took several steps back so that he was positioned between the back of the car and the closed garage door, in an attempt to "get into some type of covered position." Ulrich Dep. at 76:10-20. Sgt. Ulrich stated that he could not retreat any farther behind the car because he was already up against the garage door. Def. Ex. V (Ulrich Interview), ECF No. 51-1 at 28:24-29:2, 32:10-16; Pl. Ex. I (Ulrich Interview), ECF No. 60-9 at 54:19-21.

Deputy Weyhrauch then lost sight of Mr. Craig due to the angle of the doorway. Weyhrauch Dep. 71:7, 71:14-15, 73:2-3. Sgt. Ulrich continued to yell "drop the weapon." Weyhrauch Dep. at 73:2-12; Ulrich Dep. at 77:1-3. Sgt. Ulrich then "briefly took [his] eyes off Mr. Craig to look at [his] radio." Ulrich Dep. at 77:7-8. When Sgt. Ulrich refocused on Mr. Craig, Sgt. Ulrich says that he "saw Mr. Craig turn, the weapon pointed at [Sgt. Ulrich], and his finger barreling down on the trigger right at [Sgt. Ulrich]." Ulrich Dep. at 77:8-11; *see also* Def. Ex. V (Ulrich Interview) at 28:16-18 ("that's when I saw the – the gun, uh, being raised and the trigger being pulled"); Pl. Ex. I (Ulrich Interview) at 13:7-8. According to Sgt. Ulrich, when Sgt. Ulrich believed that Mr. Craig was pulling the trigger, Sgt. Ulrich then fired four shots, at least one of which hit Mr. Craig in the right upper chest. Ulrich Dep. at 77:12-13, Reyes Dep. at 57:17-19; Def. Ex. V (Ulrich Interview) at 29:8-16; Pl. Ex. I (Ulrich Interview) at 13:8-10 ("I saw him pulling the trigger and I was already out with front sight on him and I saw him squeezing and I fired about four times right at him."); Def. Ex. S-7 (photo showing markers for four bullet casings); Def. Ex. M-1 at 56:58-57:04 (radio traffic reporting "gunshot wound to the right upper chest"); Def. Ex. N-1 at 10:46-49 (audio from dash camera of four shots fired).

Sgt. Ulrich then radioed dispatch, "shots fired – shots fired" and requested emergency medical assistance. Def. Ex. L at 11:19-23 (dispatch radio transcript); Def. Ex. M-1 at 55:31-55:41, 55:59-56:03 (dispatch radio audio); Def. Ex. N-1 at 10:50-57 (dash camera audio). According to the audio recording of the radio traffic, less than a minute elapsed between when Deputy Weyhrauch stated that the officers were entering the garage and when Sgt. Ulrich radioed

that shots were fired.  *See* Def. Ex. M-1 at 54:53-55:41.

Deputy Laguardia ushered Mrs. Craig out to a car to wait for the scene to clear.  Def. Ex. Q (Mrs. Craig Interview), ECF No. 54-10 at 61:15-17.  After additional deputies arrived, Deputy Weyhrauch "checked down that hallway, sort of like a protective sweep, making sure there was no other outstanding person in that home that could potentially . . . be armed, may be a danger to [the officers]."  Weyhrauch Dep. at 78:10-14.  Sgt. Ulrich and Deputies Weyhrauch, Reyes, and Laguardia were then separated from one another as a matter of protocol.  Weyhrauch Dep. at 78:23-79:19.

Mr. Craig remained conscious and in pain through his arrival at Valley Medical Center, but Mr. Craig later died on the operating table from his injuries.  Pl. Ex. L, ECF No. 60-12.

### 3. Mrs. Craig's Testimony

In her videotaped interview late at night after the shooting, before she knew whether Mr. Craig had survived and without the presence of an attorney, Mrs. Craig recounted her perspective of the day's events.  *See* Mrs. Craig Interview.  Mrs. Craig explained that Mr. Craig was upset about something having to do with Elizabeth and Elizabeth's boyfriend.  *Id.* at 28:24-30:3.  Mrs. Craig stated that her husband sometimes had a "very bad temper" and that he "gets mean" when he is worried about something.  *Id.* at 16:19, 16:25, 20:19-22.  Mrs. Craig confirmed that the phone rang "all day" but neither she nor Mr. Craig answered it, which was unusual.  *Id.* at 69:24-71:1.  Specifically, Mrs. Craig said that Mr. Craig told Mrs. Craig not to answer the phone because he was upset with Elizabeth.  *Id.* at 70:10-71:1.

Mrs. Craig said that she wears hearing aids in both ears but Mr. Craig did not wear hearing aids and had good hearing.  *Id.* at 95:12-25.  Mrs. Craig and Mr. Craig were sitting at their table when they heard knocking at the front door but Mr. Craig instructed Mrs. Craig not to answer the door or look out the window.  *Id.* at 35:14-37:5, 101:1-6.  Mrs. Craig noted that the banging at the front door went on for a long time.  *Id.* at 36:15-24.  However, Mrs. Craig did not hear anyone say anything during the knocking.  *Id.* at 38:13-20.  Mrs. Craig said that "somebody then come to backyard [*sic*]."  *Id.* at 37:10-11.  Mrs. Craig could see that the person in the backyard was using a

United States District Court<br>Northern District of California

flashlight and became scared. *Id.* at 38:20-23, 92:16-17, 92:23-93:23. Then, about thirty minutes after the knocking began, someone knocked on the front door again. *Id.* at 45:15-19. In the meantime, the Craigs watched television at a low volume so that the people outside would not hear the television. *Id.* at 73:23-74:24. Mr. Craig instructed his wife to remain quiet. *Id.* at 45:13, 94:13. Mrs. Craig explained that a Boy Scout and his father had come to the Craigs' door a few days before at a similar time, around 8:30 p.m., and Mrs. Craig had answered the door, but Mr. Craig told Mrs. Craig not to answer the door the next time. *Id.* at 87:19-88:2. Mrs. Craig said that on the night of the shooting, she and Mr. Craig did not discuss calling 911 in response to the knocking or the people in their backyard. *Id.* at 89:11-24, 94:3-4.

Eventually, Mr. Craig retrieved his gun from the bedroom. *Id.* at 49:19-50:22. After the door leading to the garage opened, Mrs. Craig followed Mr. Craig and saw some of the officers in the garage, but she did not hear the officers say anything. *Id.* at 51:5-21, 56:9-20 (stating that Mrs. Craig was standing behind Mr. Craig), 61:6-13 (in response to question, "did they say Police," Mrs. Craig initially responded "yeah huh" and then "no" and "no say anything"), 87:6-7. Mrs. Craig also stated that her husband did not say anything to the officers. *Id.* at 51:23-25, 52:20-21. Mrs. Craig stated that she believed that Mr. Craig had fired his gun, although she also said "I don't know" and indicated that the events had moved very fast. *Id.* at 52:25-53:4, 94:20-95:4.

In the same interview the night of the shooting, Mrs. Craig also stated that Mr. Craig pointed his gun at the officers. Def. Ex. R. Specifically, the interviewer asked Mrs. Craig, "did he have it like this" while gesturing with his arm perpendicular to his body and his hand as if aiming a gun, "or did he have it like this," while gesturing with his arm parallel to his body and his hand as if holding a gun down by his side. *Id.* Without hesitation, Mrs. Craig responded, "I think pointing," and raised her arm and held her hand in front of her body as if aiming a gun at the interviewer. *Id.*; *see also* Mrs. Craig Interview at 102:12-16.

In her deposition, Mrs. Craig testified that Mr. Craig was holding the gun at his side. Def. Ex. H (Mrs. Craig Dep.), ECF No. 55-8 at 82:23-83:4. Defendants' counsel then asked, "He didn't point it?" *Id.* at 83:5. Mrs. Craig responded, "Point it the last minute. [*sic*]. That's all.

Never point at the people (incomprehensible)." *Id.* at 83:6-7. Defendants' counsel asked, "At the last minute, he pointed it?" *Id.* at 83:8. Mrs. Craig responded, "Yeah." Mrs. Craig's counsel then asked, "Where did he point it last second?" *Id.* at 83:11-12. Mrs. Craig then stated "I think just maybe there. That's all. Pointed it. Maybe towards here. I don't know. Maybe here." *Id.* at 83:12-15. As she was giving her answer, Mrs. Craig gestured as if pointing a gun toward the ground and then toward the ceiling. Def. Ex. I (excerpt of deposition video). Defendants' counsel then asked again "at some point, did Gene lift the gun up?" Mrs. Craig Dep. at 84:17. Mrs. Craig responded, "No, I don't think so." *Id.* at 84:18. Defendants' counsel asked, "You didn't see that?" *Id.* at 84:19. Mrs. Craig replied, "No, I don't see that, but I don't think so, no. Because no mark or no nothing. Bullet, there are no mark or bullets. Only the police bullet in the house." *Id.* at 84:20-22. Mrs. Craig then stated again that she did not remember Mr. Craig lifting his gun up. *Id.* at 85:3-4.

**B.    Procedural History**

Plaintiff filed the original complaint in this action on April 17, 2017. ECF No. 1. On May 3, 2017, Plaintiff filed a first amended complaint. ECF No. 13. On May 18, 2017, Defendants filed an answer to the first amended complaint. ECF No. 14. On August 3, 2017, the parties filed a stipulation to allow Plaintiff to file a second amended complaint. ECF No. 29. The Court granted this stipulation on August 14, 2017, ECF No. 30, and Plaintiff filed the operative second amended complaint on August 15, 2017, ECF No. 31 ("SAC"). On August 29, 2017, Defendants answered the SAC. ECF No. 34.

On June 7, 2018, Defendants filed the instant motion for summary judgment. ECF No. 49. On June 21, 2018, Plaintiff filed an opposition. ECF No. 59 ("Opp'n"). On June 28, 2018, Defendants filed a reply. ECF No. 65 ("Reply").

**II.    LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. However, on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

Additionally, when, as here, there is videotape evidence of the incident in question, the Court at summary judgment must view 'the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

**DISCUSSION**

Mrs. Craig asserts the following eight claims against Defendants: (1) 4th Amendment Violation – Excessive Force (42 U.S.C. § 1983); (2) Negligence (Wrongful Death); (3) Battery (Wrongful Death); (4) Municipal Liability – Inadequate Training (42 U.S.C. § 1983); (5) Municipal Liability – Unconstitutional Custom, Practice, or Policy (42 U.S.C. § 1983); (6) Bystander Emotional Distress; (7) Bane Act Violation (Cal. Civ. Code § 52.1); and (8) 4th Amendment Violation – Unlawful Entry (42 U.S.C. § 1983).  SAC.

The Court begins by address Mrs. Craig's § 1983 and *Monell* claims and then turns to Mrs. Craig's state law claims.

**A.     Section 1983 Claims for Fourth Amendment Violations**

Mrs. Craig's § 1983 claims allege that Defendants violated Mr. and Mrs. Craig's Fourth Amendment rights by unlawfully entering the Craigs' home and violated Mr. Craig's Fourth Amendment rights by unlawfully using deadly force against Mr. Craig.  Defendants argue that summary judgment is appropriate on Mrs. Craig's § 1983 claims because Defendants are entitled to qualified immunity.

**1.   Legal Standard for Qualified Immunity**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam).  Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks and brackets omitted).  The qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mendez v. County of Los Angeles*, 815 F.3d 1178, 1186 (9th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), *overruled on other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017).  "To determine whether an officer is entitled to qualified immunity, [the Court] ask[s], in the order [it] choose[s],

(1) whether the alleged misconduct violated a [constitutional] right and (2) whether the right was clearly established at the time of the alleged misconduct." *Hernandez v. City of San Jose*, --- F. 3d ---, 2018 WL 3597324, at *4 (9th Cir. July 27, 2018) (quoting *Maxwell v. County of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013)) (alterations in *Hernandez*); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (same). Qualified immunity applies unless the answer to both questions is "yes." *See Pearson*, 555 U.S. at 232.

The Court begins by discussing whether Mrs. Craig has shown facts that establish a violation of a constitutional right. The Court first examines whether the officers' entry into the Craigs' garage and home violated the Craigs' Fourth Amendment rights, and then the Court turns to the use of force against Mr. Craig.

### 2. Entry into Garage and House Was Not a Fourth Amendment Violation

"[T]he home is perhaps the most sacrosanct domain, where one's Fourth Amendment interests are at their zenith." *Fisher v. City of San Jose*, 558 F.3d 1069, 1082 (9th Cir. 2009) (en banc); *see also Bonivert v. City of Clarkston*, 883 F.3d 865, 873 (9th Cir. 2018) ("It has long been recognized that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (quoting *Payton v. New York*, 445 U.S. 573, 585-86 (1980))). Thus, "[i]t is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions," even with respect to searching a home. *Id.* "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id.* "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)); *see also Kentucky v. King*, 563 U.S. 452, 460 (2011) (same). This emergency aid exception to the warrant requirement is rooted in law enforcement's "community caretaking function." *See United States*

United States District Court
Northern District of California

*v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003).

The Ninth Circuit applies a two-part test to determine whether the emergency aid exception permits a warrantless search. *See United States v. Snipe*, 515 F.3d 947, 951-952 (9th Cir. 2008) (adopting two-part test after holding that the Ninth Circuit's previous three-part test, drawn from *United States v. Cervantes*, 219 F.3d 882 (9th Cir. 2000), which included an inquiry into the officer's subjective intent, did not survive the U.S. Supreme Court's decision in *Brigham City*). Specifically, the Court "examine[s] whether: '(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need.'" *Ames v. King County, Wash.*, 846 F.3d 340, 350 (9th Cir. 2017) (quoting *Snipe*, 515 F.3d at 952).

Law enforcement officers "must demonstrate 'specific and articulable facts to justify the finding' of . . . emergency." *Sandoval v. Las Vegas Metro. Police Dept.*, 756 F.3d 1154, 1161 (9th Cir. 2014) (quoting *LaLonde v. County of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000)). However, "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (internal quotation marks omitted). Rather, the question is "whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Id.* (quoting *Brigham City*, 547 U.S. at 406). The Court must "assess officers' actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Sandoval*, 756 F.3d at 1163 (quoting *Ryburn v. Huff*, 565 U.S. 469, 477 (2012)). "The fact that an emergency does not ultimately materialize has no bearing." *United States v. Jones*, 583 F. App'x 729, 730 (9th Cir. 2014) (citing *Fisher*, 558 U.S. at 49).

"Because there is no dispute that the officers failed to obtain a warrant before entering [the Craigs' garage or] home, the entry was presumptively unreasonable." *Bonivert*, 883 F.3d at 873. Defendants assert that the officers' warrantless entry into the Craigs' garage and home was nevertheless justified by the emergency aid exception. Mot. at 12-14. Under controlling Ninth

Circuit precedent, Defendants are correct.

Specifically, the Ninth Circuit's decision in *Martin v. City of Oceanside*, 360 F.3d 1078

(9th Cir. 2004), is directly on point. The Ninth Circuit recounted the facts in *Martin* as follows:

> On December 28, 1999 Dr. Ronald Trotman phoned the Oceanside Police
> Department from Portland, Oregon with an urgent request to check on the safety
> of his daughter, Traci Trotman ("Traci"). He had been unable to reach her for
> several days and told the police he was "extremely concerned" about her welfare,
> "and felt she could be in trouble." *Martin v. City of Oceanside*, 205 F.Supp.2d
> 1142, 1144 (S.D. Cal. 2002). He also gave the police an accurate description of
> her car. Around 4:30 p.m., acting on this "check the welfare" request, Officer
> Kelly arrived at Martin's home, where Traci was reportedly living as a roommate.
> He knocked and rang the doorbell, but no one answered. Unbeknownst to Officer
> Kelly, Martin and Traci were inside the home, but did not respond to his implicit
> request for an audience. Although they were aware that a uniformed police
> officer was at the door, they mistakenly and without substantial reason assumed
> that Martin's ex-wife had called the police and made a false accusation, and thus
> irresponsibly decided to ignore the officer's attempt to speak with them.
>
> Officer Kelly observed that Traci's car was in the driveway, and had headquarters
> call her phone number. Traci and Martin ignored the call. Officer Kelly then
> walked to the side of the house where he found an unlocked door to the garage. It
> is disputed whether or not Officer Kelly announced his presence before entering
> the garage, but once inside he found an unlocked door leading to the main part of
> the house. At this point, Officer Kelly exited the garage. "Fearing that a crime
> could be in progress," he requested an additional officer. *Id.* at 1145.
>
> While waiting for the other officer to arrive, Officer Kelly went next door, where
> the neighbor told him that she had seen a woman at the residence on Christmas
> day, three days prior, and a man there the day before. She added that because the
> occupants' cars were in the driveway, they should be home.
>
> When Officer Ekeland arrived, both officers entered the house through the garage
> with their flashlights on and guns drawn.

*Id.* at 1080-81.

The Ninth Circuit concluded that the emergency aid exception applied.[2] *See id.* at 1081-

---

[2] The Ninth Circuit applied the three-part test from *Cervantes*, 219 F.3d 882, to analyze the emergency aid exception in *Martin*. *See Martin*, 360 F.3d at 1081-82. As mentioned above, the Ninth Circuit modified its test in *Snipe*, 515 F.3d 947, to eliminate the inquiry into the officer's subjective intent for conducting the search. Thus, the three-part test from *Cervantes* is more stringent than the current two-part test from *Snipe*, and as a result the Ninth Circuit's holding in *Martin* still controls.

Case No. 17-CV-02115-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

82. Specifically, the Ninth Circuit first determined that "the officers had reasonable grounds to believe that there existed an immediate need for their assistance" based on Traci's father's phone call, the fact that Traci's car was in the driveway, the neighbor's opinion that Traci should be home, the lack of response to repeated knocking, and an unanswered call to Traci's phone. *Id.* at 1082. The same facts supported the officers' conclusion that the scope of their search should include the areas of Martin's home where Traci could potentially be located. *Id.* The Ninth Circuit highlighted that it had reached the same conclusion in *Murdock v. Stout*, 54 F.3d 1437 (9th Cir. 1995), where it held that the emergency aid exception applied where a neighbor reported suspicious activity at a home, there were indications that someone was at the home, and no one responded to the officers' shouts or phone calls. *Martin*, 360 F.3d at 1082-83.

In the instant case, like in *Martin*, law enforcement officers initiated a welfare check in response to a family member reporting concern after being unable to contact Mr. Craig. Here, like in *Martin*, the officers confirmed that the Craigs' car was at the house. Here, like in *Martin*, a neighbor opined that if the car was at the house, the Craigs should be, too. Here, like in *Martin*, the Craigs failed to respond to repeated knocking and phone calls. Accordingly, here, like in *Martin*, the officers had objective reasons to believe the Craigs should be home but were not responding. Moreover, the officers in the instant case also knew that the Craigs were elderly, that Mr. Craig had heart problems, and that Deputy Weyhrauch had heard a crashing sound in the home and had heard someone say "hel-," which could have been "help." In addition, Elizabeth, who called 911 to request the welfare check, said that "something bad happened between her grandparents," Laguardia Dep. at 42:23-43:5, and Mr. Marshall, a close family friend, told Deputy Laguardia that he had witnessed Mr. Craig threaten to hit Mrs. Craig's head against their car, *id.* at 33:20-34:1. Mr. Marshall expressed a concern about a potential murder-suicide scenario. Def. Ex. O at 6:25-7:12, 15:19-21. The officers also knew that Mr. Craig possessed firearms in the home. Laguardia Dep. at 41:18-23; Weyhrauch Dep. at 42:25-43:3; Def. Ex. L at 8:24-9:2. Putting all these facts together, the officers had "an objectively reasonable basis for concluding that there was an imminent need to protect" the Craigs from serious harm. *Snipe*, 515 F.3d at 952;

20

*see Martin*, 360 F.3d at 1083. The scope and manner of the search were also reasonable because all of the same evidence, plus the lights in the house and the garbage bins in the driveway, indicated that the Craigs were inside the house. *See Martin*, 360 F.3d at 1082.

Thus, like in *Martin*, "the officers' warrantless entry falls squarely within the emergency aid exception and community caretaking function, and as a result [the Craigs'] Fourth Amendment right[s] to be secure in [their] home clearly w[ere] not violated." *Martin*, 360 F.3d at 1083; *see also Sheehan*, 135 S. Ct. at 1774 ("Reynolds and Holder knocked on the door, announced that they were police officers, and informed Sheehan that they wanted to help her. When Sheehan did not come to the door, they entered her room. This was not unconstitutional."); *United States v. Allen*, 178 F. App'x 722, 723-24 (9th Cir. 2006) (holding that emergency aid exception applied where police entered the motel room of a person who had been reported missing and potentially suicidal, where the television in the room was on, the dead-bolt lock on the motel room door was engaged from inside the room, and no one answered knocks, bangs, or kicks on the door).

Mrs. Craig attempts to distinguish *Martin*, but her arguments are not persuasive. First, Mrs. Craig argues that "Sgt. Ulrich knew that the granddaughter had only been trying to reach her grandparents *that day*," whereas the father in *Martin* had been unable to reach his daughter for several days. Opp'n at 15. However, Mrs. Craig does not explain why a difference of two days in the length of nonresponsiveness that prompted the family member to initiate a welfare check would make a difference to the analysis where, as here, there are signs after the welfare check was initiated that the Craigs were home but not responding. Indeed, in *Murdock*, upon which the Ninth Circuit relied in *Martin*, the emergency aid exception applied after the police saw signs that a resident appeared to be home but was not responding, even though the suspicious activity that prompted the police investigation only took place that same day. *See Murdock*, 54 F.3d at 1439, 1442-43. Here, once the welfare check was initiated, it is undisputed that there were signs that the Craigs were at home but were not responding to the officers' phone call or nearly forty-five minutes of knocking and announcing. The fact that Elizabeth had only been trying to reach the Craigs for one day before initiating a welfare check does not outweigh the other objective signs

21

that the Craigs were in need of aid.

Mrs. Craig next argues that in *Martin*, the Ninth Circuit held Martin solely responsible for the officers' entry "after he chose to play hide-and-go-seek with the authorities" after he knew police were at the door, whereas "Sgt. Ulrich had no facts *before entering* to suggest that Mr. Craig knew law-enforcement officers were outside." Opp'n at 15. However, Mrs. Craig does not explain why this distinction would lead to a different conclusion on the application of the emergency aid exception, and thus has failed to explain why it is material. Indeed, Mrs. Craig's argument—that Sgt. Ulrich had no facts to suggest that the Craigs were purposefully ignoring law enforcement—is actually consistent with the emergency aid exception. If Sgt. Ulrich knew the Craigs were fine but simply choosing to ignore law enforcement, then the emergency aid exception would not apply. Moreover, nothing in *Martin* suggests that the officers in that case knew that the residents were knowingly avoiding law enforcement, so the officers' knowledge in the instant case is indistinguishable from *Martin*. Finally, the passage from *Martin* that Mrs. Craig references focused not on whether the emergency exception applied, but instead on whether there was a genuine dispute of material fact about whether the officers knocked and announced before entering the home. *See Martin*, 360 F.3d at 1083-84. For all of these reasons, Mrs. Craig's attempts to distinguish *Martin* fail.

Separately, Mrs. Craig argues that a reasonable jury could conclude that a reasonable officer may have thought that "Mr. Craig failed to answer the phone simply because he did not want to speak to his granddaughter—or anyone else." Opp'n at 15. Elsewhere, Mrs. Craig argues that Mr. Craig had no legal duty to answer a phone call. *Id.* at 18. Similarly, Mrs. Craig argues that a reasonable officer could conclude that Mr. Craig did not answer the door because it was nighttime and either Mr. Craig wanted to be left alone or was afraid. *Id.* at 15. However, the proper inquiry is not whether a reasonable officer could have drawn different conclusions from the facts before Sgt. Ulrich at the time. The inquiry is whether the facts before Sgt. Ulrich at the time provided an objectively reasonable basis for the conclusions that Sgt. Ulrich actually drew. As *Martin* makes clear, the facts of the instant case as known to Sgt. Ulrich at the time provided an

Case No. 17-CV-02115-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

objectively reasonable basis to conclude that one or both of the Craigs were in imminent need of assistance. *See Fisher*, 558 U.S. at 49.

Moreover, in a case with some factual similarities to the instant case, the U.S. Supreme Court reversed the Ninth Circuit's denial of qualified immunity and cautioned against evaluating in isolation each separate event in a string of events that led to the warrantless entry of a house. *See Ryburn*, 565 U.S. at 476-66. In *Ryburn*, the U.S. Supreme Court criticized the Ninth Circuit for finding it "irrelevant that the Huffs did not respond when the officers knocked on the door and announced their presence and when they called the home phone because the Huffs had no legal obligation to respond to a knock on the door or to answer the phone." *Id.* at 475. The U.S. Supreme Court observed that "[i]t should go without saying" that "there are many circumstances in which lawful conduct may portend imminent violence," and added that "it is a matter of common sense that a combination of events each of which is mundane in isolation may paint an alarming picture." *Id.* at 476-77. Similarly, here, although there may have been alternate explanations for the facts before the officers, that does not mean that those facts failed to provide a reasonable basis to conclude that the Craigs needed immediate aid.

Next, Mrs. Craig impliedly argues that because Sgt. Ulrich did not knock and announce at the door between the garage and the house, the entry of the house was unconstitutional. Opp'n at 14 ("Sgt. Ulrich also admitted that he did not knock-and-announce before kicking in the door leading to the dwelling portion of the Craigs' home."). Of course, "[t]hat the government must announce its presence before entering a private home is a longstanding principle." *United States v. Combs*, 394 F.3d 739, 743 (9th Cir. 2005). "The general practice of physically knocking on the door, announcing law enforcement's presence and purpose, and receiving an actual refusal or waiting a sufficient amount of time to infer refusal is the preferred method of entry." *Id.* at 744. However, "the knock and announce principle is a part of the reasonableness inquiry" under the Fourth Amendment, "rather than a prerequisite for constitutional entry." *Id.* at 743. As part of this inquiry, the Court "must examine what, if any, notice the police gave before entry and the likelihood that the notice alerted those inside the home to the officer's presence and purpose." *Id.*

23

at 745. Moreover, the U.S. Supreme Court has acknowledged that futility could justify a no-knock entry. *See Brigham City*, 547 U.S. at 406; *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

Here, to find that Sgt. Ulrich's failure to knock and announce at the door between the garage and the home would be to apply precisely the type of rigid requirement that the Ninth Circuit rejected in *Combs*. It is undisputed that the officers knocked on the Craigs' front door, back door, and windows for approximately forty-five minutes before eventually forcing entry through the garage door. The officers and Mr. Akimoto all testified that they loudly announced their presence throughout this time period. Although Mrs. Craig has consistently stated that she did not hear the officers ever say anything during the knocking, her account is not sufficient to raise a dispute of material fact because it is contradicted by video evidence. Specifically, the audio from the dash camera of Deputy Weyhrauch's patrol SUV clearly reveals Sgt. Ulrich knocking, announcing, and then attempting to kick in the Craigs' front door just minutes before the officers forced entry through the garage door. Def. Ex. N-1 at 7:50-8:28. At summary judgment, the Court must view 'the facts in the light depicted by the videotape," where there is one. *Scott*, 550 U.S. at 381. Moreover, based on the previous forty-five minutes of knocking, the officers could have reasonably concluding that knocking and announcing again at the door between the garage and house would be futile. *See Richards*, 520 U.S. at 394. Accordingly, because the evidence establishes that the officers knocked for up to forty-five minutes and at a minimum announced at the Craigs' front door before forcing entry through the garage door, the Court concludes that the failure to specifically knock and announce again at the door between the garage and the home did not render the entry unreasonable under the Fourth Amendment.

Finally, Mrs. Craig makes a conclusory argument that "a jury could find that Sgt. Ulrich led an illegal protective sweep" without specific and articulable facts that there were other people in the house. Opp'n at 15. Mrs. Craig does not cite any record evidence related to Sgt. Ulrich participating in a protective sweep or otherwise elaborate on this argument. The Court assumes that Mrs. Craig is referring to Deputy Weyhrauch's testimony that Deputy Weyhrauch participated in a protective sweep. However, Deputy Weyhrauch is not a named defendant in this case.

Because there is no evidence that Sgt. Ulrich ordered the protective sweep or was otherwise involved in it, Mrs. Craig has not raised a genuine dispute of material fact that "Sgt. Ulrich led an illegal protective sweep."

In sum, because the officers' entry into the Craigs' garage and house was proper under the emergency aid exception, the entry did not violate the Fourth Amendment. The Court need not decide Defendants' other argument that the entry was permissible under the exigency exception. Because the entry did not violate the Fourth Amendment, Defendants are entitled to qualified immunity as to Plaintiff's § 1983 claim based on the entry. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."), *overruled on other grounds by Pearson*, 555 U.S. 223. The Court thus GRANTS summary judgment in favor of Defendants on Mrs. Craig's § 1983 claim that Defendants' entry of the Craigs' garage and home violated the Fourth Amendment.

The Court next considers whether Sgt. Ulrich's use of deadly force against Mr. Craig violated Mr. Craig's Fourth Amendment rights.

### 3. Use of Force Was Not a Fourth Amendment Violation

The Fourth Amendment permits law enforcement to use "objectively reasonable" force. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Such an inquiry requires the Court to "consider the totality of the circumstances." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc) (citation omitted). "Factors for evaluating reasonableness include, but are not limited to: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to escape." *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (citing *Graham*, 490 U.S. at 396). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Id.* (quoting *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011)).

"Of all these factors, the 'most important' one is 'whether the suspect posed an immediate threat to the safety of the officers or others.'" *Id.* (quoting *George*, 736 F.3d at 838). "An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez*, 747 F.3d at 793 (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)). "With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available[,] so long as they act within a range of reasonable conduct." *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (quoting *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016), *overruled on other grounds by Kisela v. Hughs*, 138 Ct. 1148 (2018)).

### a. Analysis of Reasonableness Factors

#### i. Severity of the Crime

The first factor under *Graham* is the severity of the crime. *See George*, 736 F.3d at 837-38. Here, Defendants do not contend that Mr. Craig was committing any crime at the time that he was shot. The first factor thus weighs against Sgt. Ulrich's use of deadly force. *See Lopez*, 871 F.3d at 1006.

#### ii. Whether Mr. Craig Resisted Arrest or Attempted to Flee

The third factor under *Graham*, whether the suspect was actively resisting arrest or attempting to escape, also "weighs clearly" against Sgt. Ulrich's use of deadly force. *See id.* at 1006. Specifically, it is undisputed that Mr. Craig was not resisting arrest or attempting to flee. *See George*, 736 F.3d at 837-38 (recounting that district court found that third factor unmistakably weighed in the plaintiff's favor where the decedent, a sixty-five year old man, walked onto his balcony with a walker in one hand and a gun in the other).

#### iii. Whether Mr. Craig Posed an Immediate Threat

The Court "therefore [is] left with the 'most important' factor—whether [Mr. Craig] posed an 'immediate threat to the safety of the officers or others.'" *Lopez*, 871 F.3d at 1006 (quoting *George*, 736 F.3d at 838). "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris*

United States District Court
Northern District of California

*v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). However, "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (collecting cases); *see also George*, 736 F.3d at 838 ("When an individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force." (quoting *Long v. City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007))). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838. Thus, "[t]he key issue . . . is whether a reasonable jury would necessarily find that [an officer] perceived an immediate threat of death or serious physical injury at the time" the officer used deadly force. *Gonzalez*, 747 F.3d at 794. "All determinations of unreasonable force 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Henrich*, 39 F.3d at 914 (quoting *Graham*, 490 U.S. at 396-97).

To determine whether Mr. Craig posed an immediate threat, the Court must first determine the relevant facts. *See Scott*, 550 U.S. at 377. Because this issue is before the Court on summary judgment, the Court is "required to view the facts and draw reasonable inferences in the light most favorable to" Mrs. Craig, the nonmoving party, when there is a genuine dispute of fact. *Id.* at 378, 380 (internal quotation marks omitted). Here, it is undisputed that Sgt. Ulrich was positioned to the right of the door between the garage and the house after Sgt. Ulrich kicked in the door, while Deputy Weyhrauch was positioned to the left of the door. Ulrich Dep. at 71:7-11, 71:19-20; Weyhrauch Dep. at 55:23-56:1. It is undisputed that at the time Sgt. Ulrich fired, Sgt. Ulrich was positioned between the trunk of the Craigs' car and the closed garage door, about eleven feet away from the door between the garage and the house. It is undisputed that the garage was several feet below the house. Def. Exs. S-2, S-3, S-7. It is undisputed that Mr. Craig then came into the officers' view, walking slowly toward the garage while holding a gun down at his side in his right hand. Weyhrauch Dep. at 67:10-13, 68:3-5; Ulrich Dep. at 80:1-5; Pl. Ex. I (Ulrich Interview) at

27

42:15-23; Mrs. Craig Dep. at 84:7-10.

All four officers testified that at least Deputy Weyhrauch, if not also Sgt. Ulrich, yelled "drop the gun" multiple times. Weyhrauch Dep. at 68:18-24, 69:24-25; Ulrich Dep. at 72:6, 72:13-19, 73:11; Laguardia Dep. at 81:9-22; Reyes Dep. at 54:6-14, 57:4-10. Although Mrs. Craig stated that she never heard the officers say anything until after the shooting, *see, e.g.*, Mrs. Craig Interview at 61:6-13, this testimony is not enough to create a genuine dispute of fact because the audio from the patrol SUV's dash camera shows that the officers yelled while in the garage just prior to the shooting, even it is not clear what they yelled. Def. Ex. N-1. Thus, because Mrs. Craig's account—that the officers said nothing—is contradicted by the video evidence, the Court finds that there is no genuine dispute that the officers commanded Mr. Craig to drop his gun. *See Scott*, 550 U.S. at 380-81.

It is undisputed that Mr. Craig did not drop his gun and that he continued to advance slowly toward the garage. Weyhrauch Dep. at 69:3-11, 70:6-9. Mr. Craig then moved out of Deputy Weyhrauch's field of vision due to the angle of the door and Deputy Weyhrauch's position. Weyhrauch Dep. at 69:12-13, 71:7-15. Deputy Weyhrauch testified that while Mr. Craig was in Deputy Weyhrauch's field of vision, Deputy Weyhrauch did not see Mr. Craig raise the gun. Weyhrauch Dep. at 71:16-20, 72:2-4.

Sgt. Ulrich and Mrs. Craig dispute whether Mr. Craig pointed the gun at Sgt. Ulrich. Sgt. Ulrich testified that he briefly looked down at his radio and when he looked up, Mr. Craig was pointing the gun at Sgt. Ulrich with his finger on the trigger. Ulrich Dep. 77:7-11. In her interview the night of the shooting, a video of the relevant part of which the Court has viewed, Mrs. Craig also said that Mr. Craig pointed his gun and demonstrated by holding her arm perpendicular to her body. Def. Ex. R. Mrs. Craig also said that she believed Mr. Craig had fired his gun, which is consistent with Sgt. Ulrich's account that Mr. Craig had raised the gun and almost squeezed the trigger. Mrs. Craig Interview at 52:25-53:4, 94:20-95:4.

However, in her deposition more than a year later, Mrs. Craig offered several different versions of events. Mrs. Craig said that Mr. Craig was holding the gun at his side, "not the

pointed [*sic*]." Mrs. Craig. Dep. at 82:3-4. Mrs. Craig then said, "Point it at the last minute. That's all. Never point at the people." *Id.* at 82:6-7. Defendants' counsel asked, "At the last minute, he pointed it?" *Id.* at 82:8. Mrs. Craig responded, "Yeah." *Id.* at 82:9. Mrs. Craig's counsel then asked, "Where did he point it last second?" *Id.* at 82:11-12. Mrs. Craig responded, "I think just maybe there (indicating). That's all. Pointed it. Maybe towards here (indicating). I don't know. Maybe here." *Id.* at 82:13-15. The video of this portion of the deposition shows that Mrs. Craig indicated pointing a gun down, but she also pointed up and waved her hand around. Def. Ex. I. Shortly thereafter, Defendants' counsel again asked, "Now, at some point, did Gene lift the gun up?" Mrs. Craig Dep. at 84:17. Mrs. Craig responded, "No, I don't think so." *Id.* at 84:18. Mrs. Craig then explained, "No, I don't see that, but I don't think so, no. Because no mark or no nothing. Bullet, there are no mark or bullets. Only the police bullet in the home." *Id.* at 84:20-22.

The Court finds that Mrs. Craig's deposition testimony does not create a *genuine* dispute of material fact about whether Mr. Craig pointed the gun at Sgt. Ulrich. The Ninth Circuit has held that where a plaintiff's deposition testimony "is uncorroborated and self-serving" and "flatly contradicts both her prior sworn statements and the [other] evidence," there is not "'sufficient disagreement to require submission to a jury.'" *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (quoting *Anderson*, 477 U.S. at 251-52); *see also Wang v. Sony Pictures Entm't, Inc.*, 721 F. App'x 634, 636 (9th Cir. 2018) (stating that courts may exclude "testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment" (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991))). For example, in *United States v. JP Morgan Chase Bank Account Number Ending 8215 in Name of Ladislao v. Samaniego, VL: $446,377.36*, 835 F.3d 1159 (9th Cir. 2016), the claimants in a civil forfeiture action made shifting, contradictory claims to ownership of the seized property. *Id.* at 1164-65. Specifically, the claimants first asserted that the money belonged to them, then stated in their depositions that the money belonged to two other individuals. The claimants then submitted declarations that reasserted ownership interest in the funds. *Id.* The Ninth Circuit held that the

United States District Court
Northern District of California

"district court did not err when it found Claimants' assertions of ownership to be no more than back-pedaling, 'late-in-the-day declarations' insufficient to create a genuine dispute as to the ownership of the funds." *Id.* at 1165.

This Court applied the same principle in *Watkins v. City of San Jose*, 2017 WL 1739159, at *13 (N.D. Cal. May 4, 2017). In *Watkins*, police fatally shot a man, Watkins, who was charging them with a knife. Immediately after the shooting, Watkins' fiancee's mother told the police that the man was running toward the officers. *Id.* However, in a later deposition, Watkins' fiancee's mother testified that Watkins ran toward the police and then stopped, but she could not remember whether Watkins started running again. *Id.* at *13-14. The Court found that the testimony that Watkins stopped running was contradicted by all of the other evidence in the record, including the same witness's prior testimony. The Court also found that the deposition testimony "did not actually contradict the position that Decedent was moving towards the officer with a knife when he was shot" because the witness could not remember whether Watkins started running again. *Id.* at *14. The Court thus concluded that there was no genuine dispute of fact.

Here, Mrs. Craig's deposition testimony that Mr. Craig did not point the gun at the officers flatly contradicts the other evidence, including her prior statement taken the night of the shooting and the accounts that Sgt. Ulrich gave in his interview and deposition. Mrs. Craig's deposition testimony is also uncorroborated. *See Kennedy*, 90 F.3d at 1481. In addition, the Court finds that Mrs. Craig's deposition testimony is equivocal and internally contradictory. For example, Mrs. Craig said that Mr. Craig did not point the gun, but she also said that he pointed it at the last minute. When asked where Mr. Craig pointed the gun, Mrs. Craig equivocated, "I think just maybe there," "[m]aybe towards here," "I don't know," and "[m]aybe here." Mrs. Craig Dep. at 83:13-15. *See generally Olvera v. County of Sacramento*, 932 F. Supp. 2d 1123, 1150 (E.D. Cal. 2013) (finding that equivocal deposition testimony, without more, did not create a genuine issue of material fact); *see also Bond v. Knoll*, 2014 WL 7076901, at *8 (C.D. Cal. Dec. 10, 2014) (collecting cases for same proposition). Moreover, Mrs. Craig seems to explain that she believed that Mr. Craig did not point the gun at anyone because the evidence indicated that he did not *fire*

30

United States District Court
Northern District of California

the gun. *Id.* at 84:21-22 ("Because no mark or no nothing. Bullet, there are no mark or bullets. Only the police bullet in the house.").

Mrs. Craig in her deposition did not explain why she previously told investigators that Mr. Craig pointed the gun or even acknowledge the contradiction. In her Opposition, Mrs. Craig states that the interview with investigators took place late at night, after the shooting, before she knew whether Mr. Craig had survived. Opp'n at 11. Notably, however, Mrs. Craig does not directly argue that she was confused at the time of her first interview, or that upon reflection she believed that her statements during the first interview were incorrect. Mrs. Craig also argues that the way in which the investigator asked the question was leading. *Id.* Based on the videotape of the interview, the Court disagrees that the investigator's question was leading. The investigator presented Mrs. Craig with two options in an attempt to clarify her position: was Mr. Craig holding the gun in front of him, or down at his side? The investigator demonstrated both options with his arm and did not suggest a correct answer in the way he phrased the question. Mrs. Craig immediately responded, "I think pointing," and raised her arm and pointed her finger and thumb like a gun at the interviewer. Def. Ex. R. Accordingly, the Court finds that Mrs. Craig's subsequent equivocal, internally inconsistent deposition testimony is not sufficient to create a genuine dispute of fact that Mr. Craig pointed the gun at Sgt. Ulrich. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that to survive summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

"When an individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer to respond with deadly force." *George*, 736 F.3d at 838 (quoting *Long*, 511 F.3d at 906); *see also Easley v. City of Riverside*, 890 F.3d 851, 857 (9th Cir. 2018) (finding that a reasonable officer may reasonably have feared for his safety where the officer's partner shouted "he's got a gun" and the suspect grabbed his waistband, withdrew an object from his pocket, and threw it); *Gonzales v. City of Antioch*, 697 F. App'x 900, 901 (9th Cir. 2017) ("The fact that Gonzales only momentarily raised the gun and then lowered it as he was retreating

toward the garage does not create a genuine factual dispute as to whether the force used was reasonable."); *Henrich*, 39 F.3d at 914 (finding no constitutional violation where police shot decedent after decedent pointed a "long gun" at police officers); Def. Ex. X (Clark Dep.), ECF No. 66-1 at 112:19-113:3, 119:16-18, 129:23-130:5 (Mrs. Craig's police tactics expert conceding that Sgt. Ulrich was justified in shooting to protect himself if Mr. Craig pointed the gun).

This is particularly so when the officer, like Sgt. Ulrich here, has no clear line of retreat. *See Sheehan*, 135 S. Ct. at 1775 (holding that use of potentially deadly force was justified where woman with a knife was only a few feet from a cornered officer); *Mace v. City of Palestine*, 333 F.3d 621, 624-25 (5th Cir. 2003) (holding use of deadly force to be reasonable where "close quarters of a mobile home park . . . limited the officers' ability to retreat"); *see also* Clark Dep. at 108:17-109:16 (Mrs. Craig's police tactics expert agreeing that an inability to retreat can justify an officer's use of force in certain circumstances). Accordingly, the Court finds that Sgt. Ulrich had probable cause to believe that Mr. Craig was an immediate danger because Mr. Craig, standing several feet above and between ten and twenty feet away from Sgt. Ulrich, pointed his gun at Sgt. Ulrich after ignoring the officers' commands to drop the gun. Sgt. Ulrich, who was standing in the narrow space between the Craigs' car and the garage door, had no line of retreat.

### iv. Other Factors

Mrs. Craig argues that the officers should have first pursued non-lethal options, such as a "surround and call out" or at least bringing a non-lethal force option with them as they forced entry into the house. Opp'n at 20. However, under the Fourth Amendment, "[o]fficers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct [the courts have identified] as reasonable." *Glenn*, 673 F.3d at 876 (internal quotation and citation omitted). In that regard, an officer must "consider what other tactics if any were available," and only "if there were clear, reasonable and less intrusive alternatives to the force employed," does this factor weigh "against finding the use of force reasonable." *See id.* (internal quotation and citation omitted).

This is not a case where officers arrived on a scene and immediately deployed lethal force.

32

Instead, the officers attempted to make contact with the Craigs for about forty-five minutes by knocking on the front and back doors and all the windows in the house and repeatedly announcing their presence, trying to open the front door using a key, having a neighbor knock and call out, and having dispatch call the Craigs' home phone. *See* Ulrich Dep. at 80:16-23. Sgt. Ulrich explained that he did not believe a surround and call out, in which officers establish a perimeter around the house and use the PA system to address the occupants, would be appropriate because there was no indication that the Craigs were barricading themselves in the house. *See* Pl. Ex. I (Ulrich Interview) at 71:6-16. Moreover, Mrs. Craig does not explain why a surround and call out would have been likely to lead to a different result than the officers' repeated knocking and announcing.

Once the officers decided to force entry into the home, Mrs. Craig contends that it was unreasonable for Sgt. Ulrich to bring only lethal force because there was a non-lethal option available. While Mrs. Craig may be correct that it would have been the best practice to also bring non-lethal force while the officers forced entry, the failure to do so in these particular circumstances does not render the force that Sgt. Ulrich ultimately did use unreasonable for purposes of the Fourth Amendment because once Sgt. Ulrich decided to use force, only lethal force was available. *See Sheehan*, 135 S. Ct. at 1775 ("Nothing in the Fourth Amendment barred Reynolds and Holder from protecting themselves, even though it meant firing multiple rounds."); *Forrett v. Richardson*, 112 F.3d 416, 420 (9th Cir. 1997) ("The Fourth Amendment does not require law enforcement officers to exhaust every alternative before using justifiable deadly force."). As a result, the availability or lack thereof of non-lethal force to the officers in the garage is not material to the ultimate issue of whether the force Sgt. Ulrich used was reasonable under the Fourth Amendment.

Finally, Mrs. Craig faults Sgt. Ulrich for failing to specifically warn Mr. Craig that Sgt. Ulrich would use lethal force if Mr. Craig did not comply with the commands to drop the gun. Opp'n at 21. It is true that "whenever practicable, a warning must be given before deadly force is employed." *Harris*, 126 F.3d at 1201. However, the Court finds that the officers' command to "drop the gun" was sufficient warning in these circumstances. The court in *Cosentino v. Kurtz*,

Case No. 17-CV-02115-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

2013 WL 1927119 (C.D. Cal. Apr. 16, 2013), considered a similar argument.  In *Cosentino*, officers, with guns drawn, repeatedly shouted at a man wielding an axe to "drop the axe" and "drop it" before shooting him about twenty seconds later when he failed to comply.  The court reasoned that "[w]hile it may be the case that the Officers could have said 'stop' or 'stop or we'll shoot,' the Court is aware of no authority mandating the literal words officers must use in the short heat of the moment, facing an immediate threat.  Certainly, from the Officers' perspective, repeatedly shouting 'drop the axe' with guns drawn and fixed, conveyed 'stop or we'll shoot.'" *Id.* at *8.  The court also noted that it "must remain cognizant of 'the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'"  *Id.* (quoting *Graham*, 490 U.S. at 397).  The court in *Cosentino* thus found that the "warnings were sufficient in the circumstances."  *Id.*  This Court finds the reasoning in *Cosentino* persuasive and applicable to the instant case.  Thus, because the encounter lasted only a matter of seconds and the officers yelled "sheriff's office, drop the gun," with their guns drawn, the Court finds that their warnings were sufficient in the circumstances.

### b.  Conclusion as to Reasonableness of Use of Force

Based on the totality of the circumstances, the Court concludes that Sgt. Ulrich used deadly force in response to what a reasonable officer would have perceived as an imminent risk of death or serious bodily harm.  As a result, Sgt. Ulrich's use of deadly force did not violate Mr. Craig's Fourth Amendment rights as a matter of law.  Thus, Sgt. Ulrich is entitled to qualified immunity.  Accordingly, the Court GRANTS Defendants' motion for summary judgment as to the § 1983 claim for excessive force.

## B.  *Monell* Claims

Mrs. Craig argues that the County is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), based on an unconstitutional custom, practice, or policy or a failure to train.  Opp'n at 23.  Mrs. Craig in her Opposition does not identify any particular unconstitutional custom, practice, or policy.  With respect to failure to train, Mrs. Craig argues that the County failed to train Sgt. Ulrich on when it would be appropriate to use less-than-lethal force and failed

34

to require Sgt. Ulrich to take a 40-hour crisis intervention training. However, "[i]f no constitutional violation occurred, the municipality cannot be held liable." *Long*, 511 F.3d at 907. The Ninth Circuit specifically held in *Long* that "[i]f there was no constitutional violation of . . . rights, there is 'no basis for finding the officers inadequately trained.'" *Id.* (quoting *Henrich*, 39 F.3d at 916). Accordingly, because the Court has determined that no constitutional violation occurred here, Mrs. Craig's *Monell* claims fail as a matter of law. The Court thus GRANTS Defendants' motion for summary judgment on the *Monell* claims.

### C. State Law Claims

"[T]he doctrine of qualified immunity does not shield defendants from state law claims." *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1257 (9th Cir. 2016) (quoting *Johnson v. Bay Area Rapid Transit. Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013)) (alteration in original). Accordingly, the Court turns to Mrs. Craig's state law claims.

#### 1. Bane Act Claim

The Bane Act "was enacted in 1987 to address hate crimes" and "protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out by threats, intimidation, or coercion." *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (internal quotation marks omitted). "Section 52.1 'provides a cause of action for violations of a plaintiff's state or federal civil rights committed by threats, intimidation, or coercion.'" *Id.* (quoting *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)). "Claims under section 52.1 may be brought against public officials who are alleged to interfere with protected rights, and qualified immunity is not available for those claims." *Id.* at 1040-41. To establish a Bane Act claim, Mrs. Craig must ultimately prove "(1) a violation of a 'state or federal constitutional or legal right'; and (2) that the violation was achieved through 'threats, intimidation, or coercion.'" *Inman v. Anderson*, 294 F. Supp. 3d 907, 928 (N.D. Cal. 2018) (quoting *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015)).

Although there had been a dispute among California Courts of Appeal and district courts within the Ninth Circuit about whether the Bane Act "required a showing of coercion independent

35

of the coercion inherent" in a § 1983 excessive force claim, the Ninth Circuit recently adopted a position on this issue that binds this Court. Specifically, in *Reese*, 888 F.3d 1030, the Ninth Circuit followed the California Court of Appeal's decision in *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766 (2017), which clarified that "[n]othing in the text of the [Bane Act] requires that the offending 'threat, intimidation or coercion' be independent from the constitutional violation alleged.'" *Reese*, 888 F.3d at 1043 (quoting *Cornell*, 255 Cal. Rptr. 3d at 383). The Ninth Circuit went on:

> *Cornell* also makes clear, however, that the Bane Act imposes an additional requirement beyond a finding of a constitutional violation. *Cornell* explained that "[p]roperly read, the statutory phrase 'threat, intimidation or coercion' serves as an aggravator justifying the conclusion that the underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies, beyond tort relief." *Id.* at 383. Accordingly, Cornell held that "the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.* at 384. In so holding, *Cornell* adopted the specific intent standard established in *Screws v. United States*, 325 U.S. 91 (1945), for assessing criminal violations of federal civil rights. 225 Cal. Rptr. 3d at 384-85.

*Reese*, 888 F.3d at 1043.

Accordingly, the Ninth Circuit held that "the Bane Act does not require the threat, intimidation or coercion element of the claim to be transactionally independent from the constitutional violation alleged," but the Bane Act does require "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.* (internal quotation marks omitted). "Evidence simply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act." *Losee v. City of Chico*, --- F. App'x ---, 2018 WL 3016891, at *2 (9th Cir. June 18, 2018) (citing *Reese*, 888 F.3d at 1045). "Rather, [the plaintiff] must show that [the officer] 'intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances.'" *Id.* (quoting *Reese*, 888 F.3d at 1045).

Mrs. Craig argues that "a reasonable jury could find that Sgt. Ulrich violated the Bane Act

in at least three ways: (1) intentionally entering the curtilage and kicking in the door leading into the garage; (2) failing to provide knock-notice before kicking in the door to the home's living quarters; and (3) intentionally and unlawfully shooting Mr. Craig dead in violation of the Fourth Amendment[]." Opp'n at 24. Because the Court has determined that the officers' entry into the Craigs' garage and home and Sgt. Ulrich's use of force did not violate the Fourth Amendment, Mrs. Craig's Bane Act claim fails for lack of an underlying Fourth Amendment violation. Mrs. Craig in her Opposition fails to identify any other underlying constitutional or statutory violations. Even if she had identified some other underlying violation of a right, Mrs. Craig has not identified any evidence that Sgt. Ulrich had the specific intent required to establish a Bane Act claim. Thus, Defendant's motion for summary judgment is GRANTED as to the Bane Act claim.

### 2. Wrongful Death Negligence Claim

Mrs. Craig asserts a wrongful death negligence claim against Sgt. Ulrich and, vicariously, the County. Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." *Hayes v. County of San Diego*, 305 P.3d 252, 255 (Cal. 2013); *see also* Cal. Gov. Code § 820. In addition, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." *Hayes*, 305 P.3d at 255; *see also* Cal. Gov. Code § 815.2.

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes*, 305 P.3d at 255 (quoting *Nally v. Grace Community Church*, 763 P.2d 948 (Cal. 1988)) (alterations in *Hayes*). "In California, police officers 'have a duty to act reasonably when using deadly force.'" *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018) (quoting *Hayes*, 305 P.3d at 256). "To determine police liability, a court applies tort law's 'reasonable care' standard, which is distinct from the Fourth Amendment's 'reasonableness' standard." *Vos*, 892 F.3d at 1037 (citing *Hayes*, 305 P.3d at 262). "The Fourth Amendment is narrower and 'plac[es] less emphasis on

preshooting conduct.'" *Id.* (quoting *Hayes*, 305 P.3d at 262) (alteration in original); *see also C.V.*, 823 F.3d at 1257 n.6 (9th Cir. 2016) (noting that "state negligence law . . . is broader than federal Fourth Amendment law"). Accordingly, under California law, "tactical conduct and decisions preceding the use of deadly force" may "give[] rise to negligence liability" if they "show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes*, 305 P.3d at 263.

However, "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in" success of the officer's objective. *Id.* at 258 (quoting *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 537-38 (2009)) (alteration in *Hayes*). Moreover, like in the Fourth Amendment context, the reasonableness of a particular use of force under California negligence law "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

Mrs. Craig contends that a jury could conclude that Sgt. Ulrich acted negligently "by violating Defendant County's policies, his training, and generally accepted law enforcement standards as presented by expert testimony." Opp'n at 25. Mrs. Craig points out that her police practices expert, Roger Clark, opined that Sgt. Ulrich's tactical decisions leading up to the shooting contributed to Mr. Craig's death. *Id.* The Court notes that much of Mr. Clark's report and testimony is devoted to analyzing whether the officers had probable cause to enter the Craigs' home without a warrant. *See* Pl. Ex. G (Clark Report), ECF No. 60-7 at 17-27. In light of the Court's determination, above, that the officers' entry was permitted under the emergency aid exception, Mr. Clark's opinions on probable cause are not material. However, other parts of Mr. Clark's report and testimony, together with other undisputed evidence of record, are sufficient to raise a genuine dispute of material fact about the reasonableness under California negligence law of Sgt. Ulrich's tactical decisions about how to force entry of the Craigs' house.

Specifically, Mr. Clark opined that once the officers decided that they were going to force

entry, the officers should have brought in a SWAT unit or a Crisis Response Team, either of which would have had gear and tools needed for the situation that the officers on the scene did not have.  Clark Dep. at 114:17-25, 121:9-16, 123:1-8.  Specifically, a SWAT unit or Crisis Response Team would have ballistic shields, different types of less-than-lethal force, and a tool called a pick to pry the front door open.  *Id.* at 114:25-115:3.  Mr. Clark explained that prying the front door open and entering that way would have been preferable because "the garage is so congested and littered and doesn't give them free movement."  *Id.* at 115:3-6.  Those teams also would have had "small, camera-type, flexible optics that can go into a small area and expose who is in the room and what they are doing."  *Id.* at 115:8-10.

In addition, with respect to the entry itself, Mr. Clark opined that the manner in which the officers forced entry was "fraught with problems," including that the officers failed to consider using any less-than-lethal weapons and failed to bring any less-than-lethal weapons with them when they forced entry.  Clark Dep. at 62:10-12, 62:25-63:2.  According to Mr. Clark, the "professional wisdom is if you think you have somebody who could be armed and use that weapon, that – and that you're going to create a confrontation . . . you're not going to do it the way they did it, and you are going to have less lethal."  *Id.* at 63:18-25.  In his report, Mr. Clark opines that the officers' failure to consider, equip, or deploy any type of less-than-lethal weapons during the forced entry of the Craigs' residence was "a clear violation of policy and POST[3] training."  Clark Report at 14; *see also* Clark Dep. at 64:5-17 (identifying relevant policy as the Use of Lethal Force Policy and the relevant POST section as Chapter 3 of POST Learning Domain Number 20); *id.* at 66:15-67:1 (also identifying relevant POST learning domains of Crimes in Progress and Patrol Techniques).

Specifically, Mr. Clark stated at his deposition that the officers should have brought "kinetic weapons such as [a] bean bag shotgun, OC spray, [or] Taser."  Clark Dep. at 65:4-6.  If the officers did not have such less-than-lethal weapons available, Mr. Clark opined that the

---

[3] POST stands for Peace Officer Standards and Training.  Def. Ex. X (Clark Dep.), ECF No. 66-1 at 24:16-19.

officers should have waited to force entry until they had the less-than-lethal weapons.  *Id.* at 65:7-10.  Mr. Clark also states that the officers should have used "ballistic shields for cover."  *Id.* at 65:10.  In other words, in Mr. Clark's view, Sgt. Ulrich put himself in a position where he knew that Mr. Craig had firearms in the home and thus knew that an armed confrontation was possible, yet Sgt. Ulrich failed to bring a ballistic shield for protection and failed to equip himself with anything other than lethal force, which meant that "the only response available [was] lethal force." *Id.* at 84:4-6.  In Mr. Clark's opinion, these decisions were unreasonable and contrary to standard law enforcement practices.  Clark Report at 34, 37.

Mr. Clark also opines that the way Sgt. Ulrich positioned himself in the garage was contrary to standard police practice because he had inadequate cover.  Clark Dep. at 79:2-5 (observing that Sgt. Ulrich could have taken cover behind the car or ordered officers to retreat out of line of fire); *id.* at 82:12-13 (stating that officers should have gotten in best cover that they could have); *id.* at 84:21-85:12 (stating that Sgt. Ulrich "never positioned himself properly").

In sum, Mr. Clark opines that "there were far more reasonable less-than-lethal force options available besides shooting Mr. Craig," and that Sgt. Ulrich's "tactical conduct and decisions leading up to the use of deadly force" were "unreasonable, unjustified, [and] out of policy."  Clark Report at 34, 37; Clark Dep. at 132:2-8 (opining that Sgt. Ulrich's decisions to "do a crisis entry with what we have . . . through this garage, position my personnel where they are, kick this door down and stand in the way" were unreasonable).

Defendants argue that, as a matter of law, an expert's opinion that the officers' actions were unreasonable cannot alone create a genuine dispute of material fact sufficient to survive summary judgment.  *See* Reply at 11 (citing *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002), *abrogated on other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017)).  Whether or not this is a correct statement of law, it does not preclude the Court from finding a genuine dispute of material fact in the instant case because a reasonable jury could combine Mr. Clark's opinion with other evidence in the record to conclude that Sgt. Ulrich's preshooting actions were unreasonable under California negligence law.  Indeed, the Ninth Circuit has

40

observed that expert opinion is relevant for establishing the standard of care and has relied on expert opinions combined with other record evidence to reverse orders granting summary judgment on negligence claims. *See, e.g.*, *Young Han v. City of Folsom*, 695 F. App'x 197, 199-200 (9th Cir. 2017) (noting that "[i]t is universally accepted that the standard of care in a particular industry may be established by its practitioners" and reversing grant of summary judgment on negligence claim based in part on expert opinion about generally accepted police practices).

Specifically, in addition to Mr. Clark's opinions, it is undisputed that Sgt. Ulrich and Deputy Weyhrauch were qualified to use a less-than-lethal launcher and that the officers had access to a less-than-lethal launcher at the time that they forced entry of the Craigs' home. Pl. Ex. A (Ulrich Dep.), ECF No. 60-1 at 13:11-14:25; Pl. Ex. I (Ulrich Interview) at 46:18-23. In addition, it is undisputed that Deputy Weyhrauch "typically carries a shield" but did not bring the shield into the garage because he instead was carrying a rifle. Pl. Ex. I (Ulrich Interview) at 62:40-9. No other deputies brought a shield, and the deputies did not have any breaching tools when they forced entry. *Id.* at 62:5-13.

It is also undisputed that Sgt. Ulrich did not consider using less-than-lethal weapons or discuss less-than-lethal options with the other officers before forcing entry. Pl. Ex. A (Ulrich Dep.) at 67:17-23; Pl. Ex. I (Ulrich Interview) at 46:15-17, 54:23-55:3. Sgt. Ulrich gave potentially conflicting reasons for this failure to consider less-than-lethal options. Sgt. Ulrich told investigators soon after the incident that he did not consider less-than-lethal options necessary because he did not anticipate encountering any violent resistance from anyone in the home. Pl. Ex. I (Ulrich Interview) at 51:9-21, 55:9-14, 55:17-18. However, in his deposition, Sgt. Ulrich stated that he did not consider using less-than-lethal weapons because "I'm not going to bring a less lethal launcher to somebody who could possibly have firearms." Ulrich Dep., ECF No. 60-1 at 67:24-68:3.

Accordingly, interpreting the evidence in the light most favorable to Mrs. Craig and drawing all reasonable inferences in her favor, which the Court must do at summary judgment, the Court concludes that a reasonable jury could find that Sgt. Ulrich's tactical decisions about the

manner in which the officers forced entry were unreasonable under California negligence law, which is broader than Fourth Amendment law and places more emphasis on preshooting conduct. Specifically, a reasonable jury could find that, despite the foreseeability of an armed confrontation, Sgt. Ulrich unreasonably decided to force entry through the garage, failed to equip himself with less-than-lethal force, and failed to use a ballistic shield or properly establish a position of cover. A reasonable jury could conclude that these tactical decisions led to the situation in which Sgt. Ulrich's only option was to use lethal force. Thus, while the shooting itself was objectively reasonable under the Fourth Amendment, the totality of the circumstances that led up to the shooting may render the entire sequence unreasonable under California negligence law. Of course, a reasonable jury might also find that Sgt. Ulrich's decisions were within the realm of reasonableness. However, because Mrs. Craig has established a genuine dispute of material fact as to the reasonableness of Sgt. Ulrich's preshooting actions under California negligence law, summary judgment is inappropriate. Defendants' motion for summary judgment is therefore DENIED as to the negligence claim.

### 3. Battery and Negligent Infliction of Emotional Distress Claims

Mrs. Craig also brings a wrongful death battery claim and a bystander emotional distress claim. Similar to negligence, "[u]nder California law, a plaintiff bringing a battery claim against a law enforcement official has the burden of proving the officer used unreasonable force." *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1129 (9th Cir. 2010) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269 (1998)); *see also Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999) ("A prima facie case for battery is not established under California law unless the plaintiff proves that an officer used unreasonable force against him to make a lawful arrest or detention."). Defendants' only argument in favor of summary judgment on the battery claim is that no reasonable jury could find that Sgt. Ulrich used unreasonable force. Mot. at 25. For the reasons explained above with respect to the negligence claim, the Court disagrees. Accordingly, Defendants' motion for summary judgment is DENIED as to the battery claim.

With respect to negligent infliction of emotional distress, "[t]he *negligent* causing of

42

emotional distress is not an independent tort, but the tort of negligence." *Spates v. Dameron Hospital Ass'n*, 114 Cal. App. 4th 208, 213 (2003) (quoting *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1071-72 (1992)). Thus, the "traditional elements of duty, breach of duty, causation, and damages apply." *Id.* (quoting *Burgess*, 2 Cal. 4th at 1071-72). "The bystander theory recognizes a duty in the limited class of cases where a plaintiff '(1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness.'" *Id.* (quoting *Thing v. La Chusa*, 48 Cal. 3d 644, 647 (1989)). The only argument that Defendants make in favor of summary judgment on the negligent infliction of emotional distress claim is that Defendants were not negligent. Mot. at 25. Because the Court denied summary judgment as to the negligence claim, summary judgment is inappropriate here as well. Thus, Defendants' motion for summary judgment on the negligent infliction of emotional distress claim is DENIED.

## IV. CONCLUSION

For the foregoing reasons, the motion for summary judgment is GRANTED as to the § 1983 claims for Fourth Amendment violations, the *Monell* claims, and the Bane Act claim. The motion for summary judgment is DENIED as to the negligence, battery, and negligent infliction of emotional distress claims.


**IT IS SO ORDERED.**


Dated: August 9, 2018

LUCY H. KOH
United States District Judge

Case No. 17-CV-02115-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT